**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**September 10, 2004**

**Charles R. Fulbruge III**
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-40781

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARCO ABEL PARTIDA and
GERARDO VIGIL,

Defendants-Appellants.

Appeals From the United States District Court
for the Southern District of Texas

Before DeMOSS, STEWART, and PRADO, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This public integrity action involves an undercover reverse sting operation devised by government agents to snare two former corrupt city police officers. Plaintiffs-appellants Marco Abel Partida ("Partida") and Gerardo Vigil ("Vigil"), on separate occasions, assisted in the transportation of what they believed to be sizeable marijuana shipments through Donna, Texas. Following a jury trial, Partida and Vigil were convicted of various crimes in connection with their drug trafficking

participation. On appeal, Partida and Vigil raise numerous challenges to their convictions and sentences. For the reasons that follow, we affirm the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 2001, the Federal Bureau of Investigation ("FBI") began an investigation into allegations of criminal activity within the Donna Police Department of Donna, Texas. The government's investigation focused on two former police officers, acting chief of police Partida and patrol officer Vigil, after receiving information that those officers provided protection for drug shipments through their patrol districts in exchange for money. The story of how these two former police officers went astray began with the revelation of a long-term friendship between Partida and reputed drug dealer, turned government informant, Rigoberto Quintanilla ("Quintanilla").

In the spring of 1999, FBI agents learned that Partida and Quintanilla had close ties. While Partida was a sheriff's officer in Hidalgo County, Texas, Quintanilla served as a former sheriff's deputy in Hidalgo County. FBI agents also learned that law enforcement officer Partida and South Texas drug dealer Quintanilla pursued trips to Atlanta, Georgia together. Additionally, Government agents discovered that Partida and Quintanilla had been friends for years, and at one time, the two men were even roommates.

In July 1999, FBI agents interviewed Partida at the Hidalgo County Sheriff's Office. Partida informed government agents that he knew Quintanilla had transported 200 pounds of marijuana to Georgia. Partida also stated he had flown to Georgia to meet Quintanilla, at Quintanilla's expense. Upon Partida's arrival at the airport, and while placing his bags in the trunk of Quintanilla's vehicle, Partida stated he could smell a strong odor of marijuana coming from the trunk, and air fresheners in the trunk of the vehicle masking the odor. Partida also informed FBI agents that Quintanilla

2

showed him approximately $19,000 that he had amassed from transporting 200 pounds of marijuana to Georgia. Until this interview, officer Partida had never disclosed this information. Shortly after the interview, Partida resigned from the sheriff's office and was hired as a patrol officer with the local police department in the City of Donna, Texas.

In April of 1999, Quint anilla was identified by the government in connection with the transportation of about 6,000 pounds of marijuana, which was seized at the Border Patrol checkpoint in Falfurrias, Texas. Following his arrest, Quintanilla became a confidential source for the government, and provided FBI agents with information about a number of individuals. Quintanilla also informed government agents that he knew a patrol officer with the Donna Police Department, who turned out to be Partida, interested in assisting the transportation of marijuana. Quintanilla told FBI agents that Partida and another police officer had once stopped a vehicle transporting marijuana through Donna. After a fellow officer took the driver to the police station, Partida and another police officer unloaded some of the seized marijuana, hid it in a ditch, and returned to retrieve it later. Quintanilla also informed agents that Partida had accompanied him on trips to Florida, while Quintanilla picked up drug payments and Partida served as an escort.

With Quintanilla's consent, FBI agents commenced a reverse sting operation centered around Quintanilla, posing as a drug dealer, driving an empty vehicle which Partida was told would be carrying marijuana loads through Donna. Quintanilla would arrange for Partida, while on duty as a Donna police officer, to escort the load vehicle in a marked patrol vehicle to a destination outside the Donna city limits. Once the load vehicle reached the city limits, the patrol car would turn around, and the load vehicle would continue on. At a later point in time, Quintanilla would arrange a location to meet up with Partida and perform payment for the services rendered.

3

Pursuant to this operation, FBI agents began recording a series of meetings and conversations between Quintanilla and Partida, in which Partida pledged to assist in escorting bulks of marijuana through the city of Donna. In one recorded telephone conversation, Quintanilla and Partida spoke about how Quintanilla would be passing through the area with 300 pounds of marijuana in a red Suburban with tinted windows at "exactly uno." Partida replied, "OK. I'm going to be there."

In a recorded conversation on April 20, 2001, a staged event was arranged for Partida to follow a red Suburban through Donna while Partida was under the belief that he would be protecting the transport of 300 pounds of marijuana. Unbeknown to Partida, the Suburban actually contained no marijuana inside. Government agents provided Quintanilla with the Suburban (which had a video camera specially installed), and instructed Quintanilla to drive from McAllen to a location near the Donna city limits. Once Quintanilla arrived at the location near Donna, FBI agents switched on the camera. As the staged event unfolded, undercover FBI agents videotaped Partida's marked patrol vehicle "bumper locked" to the Suburban for two and a half miles as the Suburban, driven by Quintanilla, slowly drove through the city limit of Donna. Five days later, the two men met at Quintanilla's house, and in a recorded encounter Quintanilla paid Partida $500 for his assistance. As he took the money, Partida commented, "I'm in the wrong business. . . .That [was] the easiest money I ever made. Let's do it again."

As circumstances would have it, another ill fated opportunity arose for Partida to participate in drug trafficking. In May 2001, Quintanilla informed Partida of another "load coming through again." After learning of the time frame for the shipment, Partida responded "I'm there, Dude." Quintanilla and Partida discussed whether another Donna police officer was also willing to escort Quintanilla through the city. Government agents instructed Quintanilla to ask about this subject

4

because by this time Partida had risen to the rank of acting chief of police. Partida's ascendance caused a problem because he no longer drove a marked patrol car. Quintanilla insisted that he needed a marked patrol car to follow the drug shipment in order to limit the risk of "getting the load ripped off" by a rival trafficking organization. Partida had someone in mind, and he discussed with Quintanilla how much Quintanilla would pay Partida and the other officer.

The person Partida had in mind was Donna police officer Vigil. After several phone calls between Quintanilla and Partida, a meeting was finally arranged. On November 7, 2001, Partida and Vigil met with Quintanilla in a videotaped meeting at a hotel in nearby Pharr, Texas. At the behest of government agents, Quintanilla asked Vigil whether Partida forced him to provide escort services to the drug shipment. Vigil responded, "Nah . . . I'm cool with it." Vigil also stated that prior to Partida requesting his services, he planned on asking Partida about the possibility of continuing drug escort activities a second time.

Two days later, on November 9, 2001, a similar "drill" was set up, with Vigil meeting Quintanilla (who was again driving a camera-equipped red Suburban without any drugs) at the southern city limits of Donna. Quintanilla phoned Partida ahead of time to tell him that he had 300 pounds of marijuana, and he later called both Partida and Vigil as he approached the designated meeting point. The operation went off as planned, and was captured on videotape as Quintanilla drove up FM 493 with Vigil following closely behind. Later that day, after the reverse sting operation was completed, Vigil and Quintanilla met again at the Comfort Inn in Pharr, Texas. Quintanilla paid Vigil $700 (he had already received $100 "up front"). Later, Partida arrived at the hotel room, Quintanilla paid him $2,200, and Partida placed the payment in his boot.

Partida was subsequently arrested on November 12, 2002. At the time of his arrest, agents showed Partida one of the videotapes, and after watching for a while, Partida stated, "Turn it off. I don't want to see it anymore." Partida produced a handwritten confession. Vigil was also arrested on November 12, 2002. After Vigil signed a rights waiver, agents showed him a portion of one of the videotapes — after a while Vigil too stated he had seen enough and asked that the tape be turned off. Vigil then executed a written confession.

A federal grand jury issued a five-count indictment against Partida and Vigil. Count 1 charged that Partida attempted to aid, abet, and assist in the possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(B), and 846, and 18 U.S.C. § 2. Counts 2 and 5 charged that Partida — on two separate occasions — obstructed interstate and foreign commerce by means of extortion under color of official right, in violation of 18 U.S.C. § 1951(a) (Hobbs Act). Count 3 charged both Partida and Vigil with conspiring to possess 300 pounds of marijuana with intent to distribute, in violation of 21 U.S.C. § § 841(a)(1), 841(b)(1)(B), and 846. Count 4 charged Vigil with obstructing interstate and foreign commerce by means of extortion under color of official right, in violation of 18 U.S.C. § 1951(a) (Hobbs Act).

On February 18, 2003, Partida and Vigil were tried together and presented the sole defense of entrapment. Partida and Vigil presented no other evidence at the guilt phase of their trial. On February 21, 2003, a jury convicted Partida of all charges against him. The same jury convicted Vigil of extortion, but acquitted him of conspiracy.

On May 21, 2003, the district court sentenced Partida to concurrent terms of 151 months incarceration, to be followed by concurrent four-year terms of supervised release. Partida was also required to pay $400 in special assessments. In a separate hearing, on that same day, the district

court sentenced Vigil to 97 months incarceration, to be followed by a three-year period of supervised release. Vigil was also required to pay a $100 special assessment. Partida and Vigil now raise numerous challenges to their convictions and sentences.[1]

DISCUSSION

**I. Sufficiency of the Indictment**

Partida challenges the sufficiency of the indictment for failure to state an offense and failure to charge all elements of a crime. We generally review a challenge to the sufficiency of the indictment de novo. United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996). Because Partida failed to object below, the appropriate standard of review is plain error. United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003). Error is plain only when it is clear or obvious and affects the defendant's substantial rights, i.e., the error must have "affected the outcome of the district court's proceedings." Id. If these conditions are met, then we may reverse only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 631 (2002).

To be sufficient, an indictment must conform to minimal constitutional standards, standards that are met where the indictment alleges every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in a subsequent proceeding. United States v. Bieganowski, 313 F.3d 264, 285 (5th Cir. 2002) (citations and quotations omitted).

A.    Count 1 of the Indictment Properly Alleged an Offense

---

[1] Pursuant to Fed. R. APP. P. 28(I), Partida and Vigil have each attempted to adopt the arguments of the other co-defendant. Except where explicitly mentioned, our opinion assumes each argument has been adopted and the same result would apply for each co-defendant.

Partida contends that count one of the indictment charged no crime proscribed by Congress.[2] Partida asserts that strictly construing 18 U.S.C. § 2 and 21 U.S.C. §§ 841 and 846 collectively does not state an offense.[3] Specifically, Partida asserts that the plain meaning of those statutes does not proscribe "attempting to aid, abet, and assist" the possession with intent to distribute marijuana. We find this argument unavailing for two reasons: an analogous Model Penal Code provision and our circuit's precedent explicitly address and reject the basis of the contention we face here.

We begin with the analogous law of criminal attempt under Model Penal Code 5.01(3), which provides:

> A person who engages in conduct designed to aid another to commit a crime that would establish his complicity under Section 2.06 if the crime were committed by such other person, is guilty of an attempt to commit the crime, although the crime is not committed or attempted by such other person.

Model Penal Code and Commentaries (Official Draft and Revised Comments), Part I, § 5.01(3) (A.L.I. 1985). The Model Code identifies the purpose behind subsection (3) in an explanatory note as follows:

> Subsection(3) fills what would otherwise be a gap in complicity liability. Section 2.06 [of the Model Penal Code] covers accomplice liability in situations where the principal actor actually commits the offense, however, it is provided here that the accomplice will be liable if he engaged in conduct that would have established his complicity had the crime been committed.

---

[2] Although Vigil purports to adopt this issue from Partida, the record shows that Vigil was not charged with count one. We therefore find this issue moot as pertains to Vigil.

[3] Under Section 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal." 18 U.S.C. § 2 (1951); Section 846 also provides that "[a]ny person who attempts or conspires to commit any offense defined in this Subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt of the conspiracy." 21 U.S.C. § 846 (1988); conspiracy to possess marijuana with intent to distribute is an offense under this subchapter. See 21 U.S.C. §§ 841(a), 846 (1976).

8

Id. At 297-98 (explanatory note to § 5.01(3)). The quoted passage is important here because it refers to <u>attempting</u> to aid and abet a crime, similar to the facts before us, in the context of an offense for which the principle may not be guilty.

In interpreting § 5.01(3), it is clear that on the one hand, if the principal actually attempts to commit a crime, but fails to render the crime complete, the Model Code imputes liability to the aider and abettor for the same offense as the principal — attempting to commit a crime. Once the prosecution proves an attempted act of assistance with the required mens rea, the accomplice becomes the perpetrator's shadow and he is as culpable as his perpetrating cohort. On the other hand, the plain meaning of § 5.01(3) also demonstrates, as here, that if the principal had only pretended to commit the crime, and the accomplice attempted to aid the principal by "engaging in conduct that would have established his complicity had the crime been committed," the accomplice is culpable for attempting to commit the crime. <u>United States v. Washington</u>, 106 F.3d 983, 1005 (D.C. Cir. 1997). As our fellow D.C. Circuit has emphasized, the justification for permitting convictions on the basis of "attempt to aid and abet" is necessitated because "even if an offense was not actually committed, the defendant manifests the same dangerousness of character as the actor who himself attempts to commit the offense." <u>Id</u>.

In addition to the Model Code, on more than one occasion we have upheld convictions and recognized that a defendant's attempt to aid or abet in the commission of a crime is sufficient for criminal liability. In <u>United States v. Cartlidge</u>, 808 F.2d 1064, 1065 (5th Cir. 1987), an action virtually similar to ours, a known user of controlled substances informed government agents that the defendant, a deputy sheriff in Sharkey County, Mississippi, approached him and solicited payments in exchange for law enforcement protection for drug deals. The agents launched a sting operation

9

arranging for undercover agents, posing as drug smugglers, to be introduced to the corrupt deputy sheriff by the informant.  Id.  Using a concealed instrument, government agents recorded the defendant promising to provide police protection to planes landing in Sharkey County loaded with thousands of pounds of marijuana, in return for payment of $1,000 per load.  Id. at 1066.  Although the drug operation that the defendant intended to assist did not actually exist (since the undercover agents were only pretending to be drug dealers), the defendant was charged and convicted of attempting to aid and abet in the federal crime of possession and distribution of marijuana.  On appeal, this court upheld the conviction for attempting to aid and abet in the drug offense.  We emphasized that under 21 U.S.C. § 846, Congress imposes criminal punishment on "any person who attempts or conspires to commit any offense" enumerated in the Act.  Id.  Similarly, in United States v. Gutierrez, 343 F.3d 415, 417 (5th Cir. 2003), the defendant was a San Antonio police officer who agreed to provide security for drug deals, to "run interference," and to protect against competing drug dealers. Again, this court affirmed the defendant's conviction for attempting to aid and abet the possession of a controlled substance with intent to distribute.  Id. at 416.  Consistently this court has affirmed convictions of attempting to aid and abet the possession of a controlled substance with intent to distribute.

Based on our interpretation of the analogous § 5.01(3) of the Model Code and this court's precedent, we conclude that federal criminal law prohibits attempting to aid and abet the possession of a controlled substance with intent to distribute.  Hence, in light of this court's precedent and a

10

reading of the relevant statute, count 1 of the indictment sufficiently charged Partida with conduct contemplated and proscribed by Congress.[4]

B.      Counts 2, 4, and 5 of the Indictment Properly Alleged an Offense

Partida next argues that the indictment failed to state an offense in counts 2, 4, and 5, the extortion counts, because each count did not include all the elements of the crime with which Partida was charged.  Specifically, Partida maintains that Evans v. United States, 504 U.S. 255, 268 (1992), requires that the prosecution prove violations of the Hobbs Act, 18 U.S.C. § 1951(a),[5] by showing that the public official obtained payment, knowing that the payment was made in return for official acts, and that the indictment is required to charge as much also.  We conclude, however, that the indictment was not deficient for merely failing to articulate those exact words.

We begin with the text of the indictment, which states, in pertinent part:

---

[4] Partida raises an additional challenge to the judgment entered by the district court as incorrectly stating an offense not proscribed by Congress.  For the same reasons that we find the indictment correctly states an offense, we reject Partida's challenge to the judgment entered by the district court.

[5] The relevant portion of the Hobbs Act provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section —

. . . .

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951

11

> Marco Abel Partida provided assistance to Rigoberto Quintanilla in exchange for money <u>for the purpose of facilitating what the defendant believed were unlawful drug-trafficking activities</u>. Marco Abel Partida became Acting Chief of Police of the Donna Police Department and located another officer, Gerardo Vigil, who was willing to assist Rigoberto Quintanilla in connection with unlawful drug-trafficking activities.

(emphasis added). The plain text of the indictment clearly states that both Partida and Vigil, in their capacity as officers in the Donna Police Department, obtained payment with the knowledge that those payments were in return for their assistance in facilitating drug-trafficking. Additionally, in charging Partida and Vigil with these Hobbs Act violations, the indictment not only cites section 1951(a), but it also tracks the language of the statute, stating that the defendants "<u>knowingly</u> and unlawfully obstructed, delayed, affected, and attempted to obstruct, delay, and affect interstate and foreign commerce by means of extortion." <u>See</u> 18 U.S.C. § 1951(a) (emphasis added). The indictment also alleges that the payments were "induced by color of official right, in exchange for providing protection for a vehicle the defendant <u>believed was transporting three hundred (300) pounds of marihuana in Donna, Texas</u>." (emphasis added).[6] The combination of the facts set forth in the indictment, the use of the word "knowingly," and the statutory citation, taken together, provided a sufficient basis for establishing that Partida and Vigil, as public officials, obtained payment, knowing that the payments were made in return for official acts. Accordingly, we reject Partida's argument on this Hobbs Act issue.

---

[6] Our conclusion is furthered by the indictment's use of the term "by color of official right." In <u>Evans</u>, the Supreme Court opined that W. Hawkins' definition for extortion "is probably the source for the official right language used in the Hobbs Act." 504 U.S. at 261 n.4. Hawkins defined extortion as, "signifi[ng] any oppression <u>under colour of right</u>, but that in a strict sense, it signifies the taking of money by any officer, <u>by colour of his office</u>, either where none at all is due, or not so much is due, or where it is not yet due." <u>Id</u>. (quoting W. Hawkins, Pleas of the Crown 216 (6th ed. 1787)) (emphasis added).

12

## II. Jury Instructions

### A. Constructively Amending the Indictment

Partida argues that the district court erred in its jury instructions by constructively amending the indictment to permit the jury to convict on grounds not alleged in Counts 1 and 3 in the indictment.[7]

Again, because Partida did not object to the jury instructions at trial, we review Partida's constructive amendment claim for plain error only. *See* United States v. Dixon, 273 F.3d 636, 639 & n.1 (5th Cir. 2001). The Fifth Amendment provides that criminal defendants are to be tried only on charges alleged in a grand jury indictment. Id. at 639. Only a grand jury may amend an indictment once it has been issued. United States v. Daniels, 252 F.3d 411, 414 n.8 (5th Cir. 2001). A "constructive amendment" occurs when the jury is permitted to convict a defendant based on an alternative basis permitted by the statute, but not charged in the indictment. Id. at 414.

As to Count 1, Partida contends that the court's instructions permitted the jury to convict either (1) if Partida aided and abetted another's possession with intent to distribute marijuana; or (2) if Partida <u>attempted</u> to commit the substantive offense of knowingly possessing marijuana with intent to distribute. Partida maintains that the latter charge was never made in the indictment. We cannot agree.

Count 1 of the indictment charged that Partida "did knowingly attempt to aid, abet and assist in the possession of . . . [300] pounds of marijuana with intent to distribute." After reviewing the record, it is clear that this was precisely the argument the government presented at trial, as well as

---

[7] Although Vigil purports to adopt this issue, the record shows that he was not charged in Count 1 and he was acquitted of Count 3. Therefore, we find this constructive amendment issue moot as to Vigil.

13

the alleged crime reflected in the jury instructions. At trial, the prosecution adduced evidence that Partida attempted to aid in Quintanilla's "crime" of possessing marijuana with intent to distribute, by providing protection to Quintanilla's vehicle as it passed through Donna. Likewise, the district court instructed the jury, in a sequential fashion, on the elements required to prove the charge of attempting to aid and abet the possession of marijuana with intent to distribute — the instructions first covered the substantive offense of possession of marijuana with intent to distribute and next covered the meaning of "attempt" and "aiding and abetting." As such, because the district court's jury instructions did not authorize conviction of an offense not alleged, there was no constructive amendment with respect to Count 1.[8] Even assuming, that the district court's instructions constructively amended the indictment, such error did not plainly affect Partida's substantial rights. The defense at trial was entrapment; Partida argued not that he did not commit the act charged in Count 1, but instead he argued that he was entrapped into doing so. Because Partida never contested his commission of the act, but only whether he should be held criminally liable for it, Partida has failed to demonstrate that he suffered prejudice from any constructive amendment.

As to Count 3, Partida argues that the jury instruction allowed the jury to find him guilty if he either attempted to conspire or conspired to possess marijuana with intent to distribute. Partida maintains that there is no federal offense of an "attempt to conspire," and hence his conviction on this issue must be set aside. We are unpersuaded.

Count 3 of the indictment alleged that Partida conspired to possess marijuana with intent to distribute. As part of its instructions to the jury, the district court explained the elements of the

_____

[8] For the same reason, we find that Partida's claim that his Fifth and Sixth Amendment rights were violated is also meritless.

conspiracy offense. Shortly thereafter, the district court provided the jury with a legal definition of "attempt." Partida contends that this sequential instruction equates to instructing on an "attempt to conspire." After reviewing the record, we cannot find that the district court's "attempt" instruction was aimed at a separate offense of "attempted conspiracy" rather than aimed at the substantive offense, i.e., possession of marijuana with intent to distribute. Although the district court instructed on attempt both for Count 1 and again for Count 3, it is not clear from the instruction that the court was instructing the jury as to a separate offense of "attempted conspiracy." The district court did include superfluous language stating that the defendants were charged with "attempt[ing] to engage in this substantive conspiracy with intent to distribute," however, the record shows that the district court's instructions informed the jury — on two separate occasions — that the defendants were charged with conspiring to commit the substantive offense of possession with intent to distribute. Hence, we find no plain error was committed that seriously affected the fairness or integrity of the trial.

Moreover, Partida has not demonstrated plain error because his contention that the district court's attempt instructions risked confusing the jury on the correctly-instructed conspiracy offense, with an attempt to conspire, fails to demonstrate prejudice. Under plain error review, the defendant must demonstrate both that the error was "plain" and that the outcome of the trial was tainted by the error. Daniels, 281 F.3d at 184. Here, neither the prosecution nor the defense argued for a finding of attempted conspiracy, nor was evidence of a mere attempt placed before the jury. Furthermore, considering the overwhelming evidence of a fully formed conspiracy (including the videotapes, audiotapes, and Partida's written confession), no rational jury presumably would have convicted Partida of attempted conspiracy. Also, because his sole defense at trial was entrapment, Partida did

15

not refute the allegation that he committed the charged acts, rather Partida argued merely that he should not be held criminally responsible for those acts. Thus, Partida can demonstrate neither prejudice nor jury confusion over the district court's instructions when he conceded at trial that he committed the acts alleged by the government's indictment. We therefore conclude that Partida has failed to demonstrate any reversible error in the jury instructions on the attempt charge.

B.      Jury Instructions on Mens Rea Element

Partida next argues that the district court erred by failing to include a mens rea instruction to the jury on Counts 2, 4, and 5 (the extortion counts). Specifically, Partida alleges that the district court's jury instruction did not include that Partida obtained money to which he was not entitled, knowing that the money was given in return for taking, withholding, or influencing official action. We cannot agree.

Again, we apply the plain error standard of review because Partida failed to object to the jury instructions as given by the district court. United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003). Although a public official commits Hobbs Act extortion if he obtains a payment to which he is not entitled, "knowing that the payment was made in return for official acts," Evans, 504 U.S. at 268, more than one method exists by which a court may articulate that knowledge element. In Justice Kennedy's concurrence in Evans, he opined that jury instructions requiring a defendant's "wrongful use of otherwise valid official power" "made clear" the knowledge element. Id. at 277 (Kennedy, J., concurring). The phraseology "wrongful use of otherwise valid official power" is this court's verbatim pattern instruction for Hobbs Act extortion, see 5th Cir. Pattern Criminal Jury Instruction 2.74 (2001), and was the precise language employed by the district court in the instant case. This particular instruction clearly communicated to the jury that Partida and Vigil were to be found guilty

16

only if their acceptance of the payments amounted to a wrongful use of their official power, i.e., that they knowingly accepted unauthorized payments. As such, we find that the district court did not plainly err in instructing the jury as to the mens rea element required by the Hobbs Act.[9]

## III. Sufficiency of the Evidence

### A. Legally Sufficient Evidence on Count 1

Partida contends that there was insufficient evidence adduced at trial establishing his guilt, beyond a reasonable doubt, that he attempted to aid and abet a government informant's possession of marijuana with intent to distribute.[10] In essence, Partida makes an impossibility claim, asserting that because Quintanilla could not be guilty of the crime charged, he cannot be convicted of aiding and abetting such informant.[11] We are not persuaded.

A challenge to the sufficiency of the evidence is reviewed by viewing the evidence in the light most favorable to the government, determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979); United States v. Beckner, 134 F.3d 714, 718 (5th Cir. 1998). We do not consider

---

[9] The government's brief argues in the alternative, and this court agrees, that even if we were to identify plain error in the district court's jury instruction on this issue, Partida and Vigil have failed to establish prejudice under the plain error doctrine as they both admitted at trial that they accepted the payments as charged.

[10] Although Vigil purports to adopt this argument, the record shows that he was acquitted of this count, so we find this issue moot as to him.

[11] Partida's brief also raised a due process challenge to this circuit's interpretation of attempt law on the grounds that our law does not allow proof of commission of the underlying offense being attempted. After thoroughly considering this argument and the applicable law, we reject Partida's constitutional challenge.

whether the jury correctly determined guilt or innocence, but whether the jury made a rational decision. United States v. Rivera, 295 F.3d 461, 466 (5th Cir. 2002).

Partida was specifically charged in Count 1 with attempting to aid and abet the possession of marijuana with intent to distribute. Although there is no comprehensive statutory definition of attempt in federal law, in general, federal courts allow an attempt conviction if the government proves: (1) that the defendant acted with the kind of culpability otherwise required for the commission of the underlying substantive offense, and (2) that the defendant had engaged in conduct which constitutes a substantial step toward commission of a crime. United States v. Farner, 251 F.3d 510, 513 (5th Cir. 2001). Factual impossibility is not a defense to a charge of attempt. See United States v. Crow, 164 F.3d 229, 236 (5th Cir. 1999) (stating that "factual impossibility is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be").

Here, the evidence construed in the light most favorable to the government was sufficient to demonstrate the crime of attempting to aid and abet. Based on the video and audiotapes of their discussions with Quintanilla regarding facilitating the drug shipment, and each defendants' written confessions, Partida had a criminal intent consistent with the crime of aiding and abetting. Moreover, Partida's acceptance of payment to protect what they believed to be Quintanilla's drug shipment, and their actual protection of the shipment as a Suburban drove it through their patrol district,[12] constitute sufficient evidence of substantial steps that moved past mere preparation, and were strongly

---

[12] Partida, as police chief, ensured that no one would interfere with, or stumble upon, Vigil's ability to participate in the operation. Vigil, of course, accomplished the substantive act of actually meeting the Suburban and proceeding to follow Quintanilla as he drove the Suburban through the city of Donna.

18

corroborative of criminal intent. As noted above, because factual impossibility is no defense to an attempt crime, the evidence is sufficient to show an attempt to aid and abet, despite the defendants mistaken belief that actual loads of marijuana were in Quintanilla's Suburban at the time of the escort. Based on these circumstances, sufficient evidence existed to convict Partida of attempting to aid, abet, and assist in the possession of a marijuana with the intent to distribute.

B.      Legally Sufficient Evidence on Counts 2, 4, and 5

Partida also challenges his conviction on the grounds of insufficient evidence supporting his convictions on Counts 2, 4, and 5 (the extortion counts). Specifically, Partida argues that there was insufficient evidence establishing that the streets upon which defendants and Quintanilla traveled were channels of interstate commerce. Partida also argues that the "victims" of any alleged Hobbs Act violation are citizens of the state in which the alleged offenses occurred, thus interstate commerce was not affected. We disagree.

Ordinarily, we review sufficiency of the evidence challenges under the identical standard recited above; however, because Partida and Vigil essentially failed to preserve this issue for appeal,[13] we shall review whether the defendants' convictions amount to a "manifest miscarriage of justice," i.e., whether the record is devoid of evidence pointing to guilt. United States v. Delgado, 256 F.3d 264, 274 (5th Cir. 2001).

---

[13] Although Partida and Vigil moved for acquittal on Counts 2, 4, and 5 (both at the close of evidence and again after the jury returned the verdict), they asserted different grounds for their respective motions. Specifically, both claimed that they had been "induced" by Quintanilla to commit the Hobbs Act offense, not that interstate commerce was unaffected by their conduct. Because a defendant waives all other grounds not specifically set forth in a motion for acquittal, United States v. Herrera, 313 F.3d 882, 884-85 (5th Cir. 2002) (en banc), defendants have not preserved this issue for appeal.

19

We have recognized that, because drugs are traded on an interstate market, the act of interfering or facilitating narcotics trafficking is sufficient to establish an effect on interstate commerce. United States v. Villafranca, 260 F.3d 374, 378 (5th Cir. 2001) (citing United States v. Box, 50 F.3d 345, 353 (5th Cir. 1995)). Additionally, we have held that extortion which depletes funds otherwise available for drug trafficking obstructs commerce within the meaning of the Hobbs Act. Box, 50 F.3d at 353 (citing United States v. Davenport, No. 93-1216 (5th Cir. Sept. 6, 1994) (unpublished)). Both of these cases are dispositive to our reasoning on the instant facts.

Here, the record clearly shows sufficient evidence demonstrating that Partida and Vigil actively participated in the act of facilitating drug trafficking. Partida and Vigil's actions centered around protecting and facilitating the trafficking of marijuana by Quintanilla. Quintanilla's drug shipment was carried down FM 493, a road used to transport goods and for travel from one state to another. It is undisputed that both defendants provided escort services to Quintanilla as he traveled on FM 493 through, and beyond, the Donna City limits. Moreover, the record shows written confessions from Partida and Vigil admitting that they were paid by Quintanilla for their escort services. As a logical proposition, the payments received by the defendants depleted funds that would otherwise have been available for drug trafficking. Hence, we find sufficient evidence in the record to ensure that Partida's and Vigil's convictions do not amount to "manifest miscarriages of justice."

**IV.    Sentencing**

Partida and Vigil raise numerous post-conviction challenges to the district court's imposition of their sentences. We review the district court's interpretation or application of the Sentencing Guidelines de novo, but we review factual findings for clear error. United States v. Simpson, 334 F.3d 453, 455-56 (5th Cir. 2003). Because the application of § 3B1.3 is a sophisticated factual

20

determination, we review a § 3B1.3 sentencing enhancement under a clearly erroneous standard. United States v. Deville, 278 F.3d 500, 508 (5th Cir. 2002) (internal quotations and citations omitted).

Because a sentencing judge is uniquely positioned to evaluate a defendant's acceptance of responsibility, we apply a standard variously described (but without any practical differences) as "clearly erroneous," "without foundation" or "great deference." United States v. Chapa Garza, 62 F.3d 118, 123 (5th Cir. 1995). This standard requires more deference for acceptance of responsibility issues than a pure clearly erroneous standard. Id.

A.      Sentence Enhancement under U.S.S.G. § 2D1.1(b)(1)

Both Partida and Vigil maintain that the district court erred in enhancing their sentences, pursuant to U.S.S.G. § 2D1.1(b)(1), by determining that each possessed a firearm while engaged in their criminal activity. In essence, the defendants argue that their possession of firearms was merely an extension of their police uniforms and was not associated with the commission of any offense.

Section 2D1.1 (b)(1) provides for a two-level enhancement when a defendant possesses a dangerous weapon while possessing or trafficking drugs. See U.S.S.G. § 2D1.1(b)(1) (2002). The government carries the burden of proving a spacial and temporal nexus between the weapon, the drug activity, and the defendant. United States v. Cooper, 274 F.3d 230, 245 (5th Cir. 2001). This enhancement provision will not apply where the defendant is able to show that it is "clearly improbable" that the weapon was connected with the offense. U.S.S.G. § 2D1.1 n.3. Instead, for the enhancement to be proper the government must show that "the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred." Id.

21

This court has already confronted and addressed the issue of whether a sentence can be enhanced under § 2D1.1 where a defendant possessed a gun as part of his employment as a law enforcement agent. In United States v. Marmolejo, 106 F.3d 1213, 1216 (5th Cir. 1997), we held that a § 2D1.1 enhancement is proper when a law enforcement agent possesses a weapon at the time he uses his official position to facilitate a drug offense. Our court stated this enhancement applied even when the officer does not brandish, display, or have active use of the firearm during the offense. Id. Here, the defendants do not contest that § 2D1.1 adjustments may apply to law enforcement agents, instead they challenge the evidentiary basis of the district court's enhancement.

Partida objects to the firearm enhancement on the grounds that there was no evidence demonstrating that he possessed a firearm while escorting Quintanilla through the city of Donna. Relying on United States v. Siebe, 58 F.3d 161 (5th Cir. 1995), Partida specifically contends that the district court improperly presumed a firearm was connected with the drug offense despite the fact that Partida did not carry a weapon while he acted in the capacity of chief of police. We find this argument unavailing.

In Siebe, a police officer who pleaded guilty to possession of cocaine with intent to distribute was subjected to § 2D1.1(b)(1) enhancement for possessing a dangerous weapon during the commission of a drug offense. 58 F.3d at 162. The district court based its enhancement upon a presumption that Siebe possessed a gun during commission of the drug trafficking offense by virtue of the fact that he was a police officer, and therefore had been issued a firearm. Id. at 163. We reversed the district court's decision to grant the firearm enhancement, on the grounds that there was no evidence, other than the district court's unsupported presumption, that the officer possessed a weapon while committing the drug trafficking crime. Id.

22

We find Siebe inapposite to the facts at issue. Unlike Siebe, circumstantial evidence exists to support the district court's finding that the defendants possessed a weapon during the drug trafficking crime. Specifically, while there was no evidence in Siebe that the defendant committed the crimes on- or off-duty, the record shows that Partida was serving as a patrol officer, on duty, in uniform, and in a marked police vehicle, when he escorted Quintanilla through Donna. The record also shows that the Donna Police Department had a policy in place requiring uniformed officers to carry their firearms. Based on this cumulative body of circumstantial evidence, we cannot find that the district court clearly erred in finding that Partida possessed a weapon while engaging in the identified drug trafficking activities. As such, we uphold the district court's application of § 2D1.1(b)(1) to Partida.

Vigil offers a similar, but slightly different, objection to the district court's application of § 2D1.1(b)(1). Vigil argues that although he possessed the weapon while escorting Quintanilla through Donna, he did not possess a weapon while he was at the Comfort Inn committing the extortion offense. We must reject Vigil's argument.

After reviewing the record, it is clear that the district court applied the firearm enhancement based on the cross-referenced drug offense rather than for the extortion offense. Section 2C1.1(c)(1) provides that if the extortion offense was "committed for the purpose of facilitating another criminal offense, apply the offense guideline applicable to conspiracy to commit that other offense . . ." U.S.S.G. § 2C1.1(c)(1) & cmt. background (2002). Therefore, it matters not whether Vigil was actually armed at the Comfort Inn, as he was admittedly armed while he escorted Quintanilla through Donna. Accordingly, we conclude that the district court did not commit clear error in enhancing Vigil's sentence for possessing a weapon.

23

B.     Reduction for Acceptance of Responsibility

Partida and Vigil contend that the district court erred by denying them a two-level decrease in their base offense level for acceptance of responsibility.  We disagree.

Section 3E1.1 of the Sentencing Guidelines provides for the two-level decrease "if the defendant clearly demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1(a) (2002).  We have previously recognized that a defendant is not automatically precluded from receiving a reduction for acceptance of responsibility if he exercises his right to trial.  See United States v. Brace, 145 F.3d 247, 264 (5th Cir. 1995) (en banc).  In Brace, we stated that:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

Id. (quoting U.S.S.G. § 3E1.1(a) comment n. 2) (emphasis added).

Here, as in Brace, Partida and Vigil maintain that they satisfied § 3E1.1 because they went to trial to preserve the "legal issue" of entrapment.  Along these lines, Partida and Vigil note that the record shows that they fully admitted to their factual guilt. Contrary to the defendants' argument, Partida's and Vigil's assertion of entrapment is a denial of factual guilt because it was "a denial of subjective predisposition and, consequently, of the required element of mens rea."  Brace, 145 F.3d at 265.  In Brace, we emphasized the justification for our rejection of a similar "legal issue" of entrapment by concluding:

> In other words, an entrapment defense is a challenge to criminal intent and thus to culpability.  Accordingly, this is not one of those "rare situations", contemplated by the guideline commentary, in which a defendant may proceed to trial and still satisfy § 3E1.1(a).

24

Id. Because Partida and Vigil have admitted their factual conduct, but denied their guilt (specifically the element of mens rea) by claiming the defense of entrapment, their denial of criminal culpability constitutes a failure to "clearly accept responsibility" for the crimes for which they were convicted.

Vigil also argues that the denial of a reduction in his sentence was improper because the jury "accepted" his entrapment defense, and therefore he was penalized for failing to accept responsibility for acquitted conduct.[14] We cannot agree. The jury's motives in issuing a general verdict to acquit Vigil on Count 3 — the possession with intent to distribute charge — are unknown. It is not the duty of this court to speculate on the reasons for the jury's general verdict of acquittal. See United States v. Lichenstein, 610 F.2d 1272, 1279 (5th Cir. 1980) ("A court may not divine from a general verdict of acquittal such specific findings."). We also note, as the government points out, that the jury did not fully accept Vigil's entrapment defense because it convicted him of Count 4, the extortion count. The district court could have based its denial of the acceptance reduction on Vigil's act of proceeding to trial on the entrapment count. We therefore cannot conclude that the district court hinged its denial of the sentence reduction solely on a finding that Vigil refused to admit conduct for which he was acquitted. Based on the "great deference" we accord a district court's determination as to a defendant's acceptance of responsibility, we conclude that the district court had a proper basis for finding a sentence reduction not warranted.

In sum, we conclude that the district court did not err when it denied both Partida and Vigil a reduction in their respective sentences under § 3E1.1(a).

---

[14] Partida posits a separate argument that because subsequent Supreme Court decisions on entrapment altered the legal underpinnings of Brace, and we should not follow that decision. Because Partida fails to identify any post-Brace Supreme Court decision altering the underpinnings of that decision, we reject Partida's argument.

C.     Proper Legal Standard for Sentencing

Vigil next argues that the district court erred in making its findings of facts during sentencing by using a preponderance of the evidence standard when it was obliged to use the "clear and convincing" standard.  Vigil specifically contends that even though the jury acquitted him of the drug charge, the district court's application of the section 2C1.1(c)(1) extortion cross-reference to the acquitted charge improperly results in the subsequent enhancement dominating the conviction.[15] Stated differently, Vigil claims that the enhancement of his substantive conviction is a "tail that wags the dog" circumstance which may require a higher evidentiary standard than a preponderance of the evidence standard.  Because the record shows that Vigil failed to contest the district court's standard of proof during sentencing, we review for plain error.  *See* Hickman, 331 F.3d at 443.  For the following reasons, we find no plain error.

Under the Sentencing Guidelines, a district court's operative fact finding is generally subject only to a preponderance of the evidence standard.  U.S.S.G. § 6A1.3, cmt. (2002); see also United States v. Watts, 519 U.S. 148, 156-57 (1997) (finding that "[t]he Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence").  Due to a standard of proof at sentencing lower than the proof necessary to convict at trial, the scope of a sentencing court's fact finding is not limited to considering only the conduct of which the defendant was formally charged or convicted.  See United States v. Casto, 889 F.2d 562, 570 (5th Cir. 1989) (finding that a sentencing judge may sentence a criminal defendant "based on both the evidence

---

[15] Vigil argues that the district court should have applied the "clear and convincing" standard to apply the cross-reference to section 2D1.1.  Here, Section 2D1.1 already applied to Partida's sentence, because Partida's sentence was calculated without use of the cross-reference.  Hence, Partida cannot adopt Vigil's argument on this issue.

proven beyond a reasonable doubt at trial and facts which he believed had been proven by a preponderance of the evidence"). Appreciating the lower standard of proof for sentencing, has particular import in the context of acquittals. See Watts, 519 U.S. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)) (stating that an acquittal is not a finding of fact nor does an "acquittal on criminal charges [] prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt"). Our court, therefore, has specifically emphasized that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." United States v. Cathey, 259 F.3d 365, 368 (5th Cir. 2001) (quoting Watts, 519 U.S. at 157). Although resolution of the current issue does not involve questioning any of these general rules, it does involve the scope of their application.

Vigil relies on the First Circuit's decision in United States v. Lombard, 72 F.3d 170 (1st Cir. 1995). In Lombard, the criminal defendant was acquitted of murder in state court, and convicted in federal court of illegal firearms possession arising out of the murders. Id. at 172. During sentencing in federal court, the defendant received a mandatory term of life in prison based on the same murders of which he had been acquitted in state court. Id. On appeal, finding that this case presented a circumstance where the "tail has wagged the dog," the First Circuit reversed and remanded for the district court to consider whether a downward departure would have been appropriate. Id. at 187. The First Circuit justified its conclusion on the grounds that this case raised serious questions as to situations where the sentence of an individual is made more severe through the application of an enhancement and/or a cross-reference than the sentence would have been for the crime of conviction alone. Id. at 178.

27

We do not find Vigil's reliance on <u>Lombard</u> persuasive in the instant case. In <u>Lombard</u>, the First Circuit stated that its conclusions were based on a concern the defendant was ostensibly punished for the severe "enhancing" conduct of the acquittal on the state murder charge:

> The effect of the murders was not just to fix [the defendant's] sentence at some higher point within a particular range delimited by Congress for the firearms offense. Instead, the Guidelines, combined with the absence of a stated statutory maximum, essentially required the district court to determine [the defendant's] base offense level as if his offense of conviction had been first-degree murder.

<u>Id</u>. at 182. Accordingly, the First Circuit specifically observed that cases involving modest enhancements or enhancements that do not cause a sentence to exceed what would otherwise be a statutory maximum punishment were not helpful and "provide[d] little guidance" in their analysis." 72 F.3d at 186 n.16. Here, because the district court sentenced Vigil under the statutory maximum for extortion, we cannot find that he was punished for any "severe" enhancing conduct of the type found in <u>Lombard</u>. Vigil received a 97-month sentence, clearly less than the 240 months he could have potentially received had he been sentenced to the statutory maximum for his extortion conviction.

Additionally, the record shows that the district court applied the same "clear and convincing" standard Vigil now requests on appeal. The district court, in discussing whether the conduct for which Vigil had been acquitted could be used to trigger the cross-reference, found "not only by a preponderance, but also by clear and convincing evidence" that Vigil committed the substantive crime of protecting 300 pounds of marijuana. Accordingly, we recognize that not only was the district court permitted to utilize the preponderance standard in making its factual findings at sentencing, but it also found that Vigil committed the conduct

for which he was acquitted under both the preponderance and the clear and convincing standard. As such, we find no plain error.

D.    Sentence Reduction for Vigil's Role in the Offense

Vigil next contends that an adjustment was warranted because his role in the offenses of this case was less culpable than Partida's.[16] Vigil argues that the district court erred by not making such an adjustment. Specifically, Vigil contends that he did not concoct the drug trafficking scheme, instead he claims he was only a "peripheral" actor. We cannot agree.

The Sentencing Guidelines provide for adjustments to the offense level based upon the role the defendant played in committing the offense. See U.S.S.G. § 3B1, i ntro cmt. (2002). Section 3B1.2(a) of the Sentencing Guidelines provides for a four-level reduction in a defendant's sentence if the defendant was a "minimal" participant in multi-participant criminal activity. Id. § 3B1.2(a). The defendant bears the burden of establishing that he is eligible for the adjustment. Marmolejo, 106 F.3d at 1217.

In Marmolejo, the defendant sought an adjustment for being a "minimal" participant where he was convicted of conspiring to possess with intent to distribute 200-300 kilograms of cocaine. 106 F.3d at 1217. We concluded that even though the defendant appeared to be small in relation to the larger scope of the drug trafficking organization involved there, the defendant himself "accomplished much in the way of furthering their goals." Id. Here, Vigil was responsible for aiding in the trafficking of 300 pounds of marijuana. We cannot find that aiding in the transport of 300 pounds of marijuana constitutes a "minimal" contribution to a larger criminal enterprise, which

_____

[16] Because Vigil's argument requires the application of the Guidelines to him, in a fact specific manner, Partida is barred from adopting this argument. See Simpson, 334 F.3d at 454.

essentially trafficked a total of 600 pounds of marijuana. Moreover, Vigil contributed a major advancement to the crime, because he drove the only marked patrol vehicle that protected the drug shipment on that occasion. Based on Vigil's actions as the sole officer responsible for escorting Quintanilla through Donna, and without additional evidence that he was only "peripheral" to the criminal activity, we cannot find that the district court clearly erred in refusing Vigil an adjustment pursuant to § 3B1.2(a).

        E.      Abuse of Trust Enhancement

Vigil argues that because he was convicted of extortion under the color of official right, the guideline for that offense § 2C1.1, already takes his official position into account. Vigil contends, therefore, that the district court's enhancement of his sentence for abuse of a position of trust under § 3B1.3 improperly constitutes "double counting." We disagree.

As mentioned above, the Sentencing Guidelines provide for adjustments to the offense level based upon the role the defendant played in committing the offense. As relevant here, Section 3B1.3 provides for a two-level enhancement if a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (2002). Vigil fails to recognize that his sentence was calculated, via a cross-reference, using the base offense level derived from § 2D1.1, because his extortion offense was committed "for the purpose of facilitating the commission of another criminal offense," here, the transporting of marijuana through Donna. See U.S.S.G. § 2C1.1(c)(1) (2002). Hence, the upward adjustment was applied to the base offense for the drug offense, not to the base offense for the extortion offense.

Moreover, the Sentencing Guidelines expressly contemplate that the abuse of trust enhancement is applicable if the offense level for the extortion offense is determined using the cross-

30

reference in § 2C1.1(c)(1).  Id. § 2C1.1, cmt., n.3 (2002).  In an analogous action, we held that an

upward adjustment for abuse of trust was not "double counting" when the adjustment was applied

to, on those facts the base offense level for money laundering, an offense which did not take position

of trust into account.  United States v. Powers, 168 F.3d 741, 751-52 (5th Cir. 1999).  Similarly, as

applied here, the base offense levels in § 2D1.1 do not take a position of trust into account.

Accordingly, we find the district court's enhancement of Vigil's sentence pursuant to § 3B1.3's abuse

of trust provision is not clearly erroneous.

**V.       Post-Trial Motions**

A.       Written Judgment

Partida argues that the judgment of the district court incorrectly states that he was convicted

in Count 1 of attempting to aid and abet the possession of marijuana with intent to distribute.  Partida

claims once again that there is no such offense, and seeks to have the judgment corrected.  For the

reasons previously mentioned, we find no infirmity with the charged offense in Count 1 of the

indictment.  Because the judgment reflects the offense charged by the indictment, we find no error.

B.       Ineffective Assistance of Counsel

Finally, Partida argues that his trial counsel was constitutionally deficient, contending that his

counsel failed to raise at trial essentially all the issues currently before this panel.  We have previously

held that "Sixth Amendment claims of ineffective assistance of counsel should not be  litigated on

direct appeal, unless they were previously presented to the trial court."  United States v. Valuck, 286

F.3d 221, 229 (5th Cir. 2002).  While this Court will consider such claims on direct appeal in "rare

cases," the record must allow a reviewing court to "fairly evaluate the merits of the claim."  United

States v. Delagarza-Villareal, 141 F.3d 133, 141 (5th Cir. 1998).  Here, the district court did not hold

31

a hearing or rule on Partida's claim, nor does the record contains sufficient detail about trial counsel's conduct to permit this court to make a fair determination of the merits of Partida's claim. As such, we reject Partida's ineffective assistance of counsel claim as without merit.

## CONCLUSION

For the foregoing reasons, we affirm both Partida's and Vigil's convictions and sentences. The judgment of the district court is AFFIRMED.